IN THE

# ARIZONA COURT OF APPEALS
### DIVISION ONE

———————————————

STATE OF ARIZONA, *Appellee*,

*v.*

ROBERT MICHAEL PUGA, *Appellant*.

No. 1 CA-CR 23-0162
FILED 01-28-2025

———————————————

Appeal from the Superior Court in Coconino County
No. S0300CR202000036
The Honorable Stacy Lynn Krueger, Judge

**AFFIRMED**

———————————————

COUNSEL

Arizona Attorney General's Office, Phoenix
By Michael O'Toole
*Counsel for Appellee*

Coconino County Legal Defender's Office, Flagstaff
By Joseph Carver
*Counsel for Appellant*

---

**OPINION**

Judge Jennifer M. Perkins delivered the opinion of the Court, in which Judge David D. Weinzweig joined. Presiding Judge Andrew M. Jacobs specially concurred in part and dissented in part.

---

**P E R K I N S**, Judge:

¶1        We confront here the superior court's handling of for-cause juror strikes in the wake of the Arizona Supreme Court's abolition of peremptory challenges, and its related revisions to Rules of Criminal Procedure 18.4 and 18.5. Robert Puga appeals his conviction for sexual assault, arguing the court erred by not striking prospective jurors for cause and by considering a statement at sentencing made by a victim of a prior offense committed by Puga.

¶2        We affirm Puga's conviction and sentence because (1) the court complied with the revised rules when questioning prospective jurors; (2) there was no reasonable basis to believe either challenged juror could not render a fair and impartial verdict; and (3) the court did not err by considering a statement from one of Puga's prior victims at sentencing.

**FACTS AND PROCEDURAL HISTORY**

¶3        In the fall of 2019, Michelle (a pseudonym) met Puga and went on a few dates before she concluded they would be better off as friends. This upset Puga. About a month later, Michelle encountered Puga at a bar while celebrating New Year's Eve with her friends in Williams. Puga bought her a drink. Michelle left the bar and returned to her friends' house to sleep on the couch. Puga followed Michelle. He entered the friends' house and placed his penis on Michelle's mouth as she slept. The State charged Puga with one count of sexual assault.

¶4        The court and counsel repeatedly expressed concern during jury selection about empaneling a jury from the relatively low number of prospective jurors on hand.

¶5        During voir dire, the court asked all potential jurors to raise a hand if anything about the nature of the allegations would make it difficult for them to render a fair and impartial verdict. No juror raised a hand. The

court also asked whether the prospective jurors had experienced anything like the facts of this case that might affect them. Jurors 6 and 10 disclosed that they were sexual assault victims.

¶6         Juror 6 privately told the court she had experienced something "similar" to the sexual assault in this case when she was a child. When the court asked Juror 6 to "provid[e] a little more information to us about what happened," Juror 6 explained that, when she was nine, over 60 years ago, a caregiver exposed himself to her and tried to place her hands on his body while she pretended to be asleep. No charges followed, but the caregiver was "asked to leave town. That's the way things were done then, you know." Juror 6 then offered, "[s]o I don't know, you know, how that would affect me, but you just don't—you don't know."

¶7         After expressing appreciation for Juror 6's candor, the court stated, "I'll ask you a question, and if the answer is the same, that's perfectly fine. We just want you to be as honest as you can." The court then asked, "[w]ould you be able to set aside that personal experience and not let that impact you?" Juror 6 responded, "I think I might, yeah." Searching for clarity, the court told Juror 6 that "mights and maybes are difficult for us. We need to have a little bit --." Interrupting the court, Juror 6 interjected: "Yeah. Yeah. I feel pretty confident, yeah, that I would be able to be okay with that. Yeah. Like I said that was a long time ago and . . . it was handled well by my parents and those involved."

¶8         The parties also questioned Juror 6. The State asked whether her childhood experience differed from the alleged offense given that Puga's case concerned adults, not children and child abuse. Juror 6 agreed, "[r]ight. Makes a difference." Juror 6 clarified that she felt "a hundred percent" that she could decide the case based on the facts and instructions of the court. Juror 6 told defense counsel she did not "think" her childhood experience would affect her. And when defense counsel asked Juror 6 to clarify, she again denied that her experience would "affect her opinion" in the trial or lead her to favor either side.

¶9         Defense counsel moved to strike Juror 6 for cause. He described Juror 6 as "moved to tears when she was talking about her incident." The court responded, "I didn't see any crying at all." The lead prosecutor agreed Juror 6 did not cry, and the State's co-counsel averred that "[a]ll I saw was her eyes get more glassy, but I didn't see any tears." Having watched the proceedings, the court described Juror 6's emotional response as "slight," acknowledging "a slight change in her tone of voice."

¶10          The court found that Juror 6's continued assurances of fairness and impartiality clarified any ambiguity in her prior answers, so the court denied the motion to strike her for cause and seated her.

¶11          Juror 10 privately told the court she had been sexually assaulted 20 years ago, but nobody had been arrested or tried for the crime. She attended therapy, did not blame law enforcement, and did not believe the experience would affect her ability to be impartial. Juror 10 added that "a jury of your peers includes people that have been sexually assaulted." When defense counsel asked Juror 10 whether she felt she could be impartial, Juror 10 responded, "I do. Yeah."

¶12          Defense counsel moved to strike Juror 10 for cause, arguing that Juror 10's similar experience would cause her to sympathize with the victim. The court noted Juror 10's demeanor did not suggest any strong emotional response to the questions or in her answers. Finding "no indication that there is a basis to strike for cause," the court seated Juror 10.

¶13          Over a three-day trial, Puga argued he did not engage in willing behavior that could be punished criminally. He claimed to suffer from sexsomnia, a rare disorder of engaging in sexual activity while sleeping. To refute Puga's claim, the State introduced evidence that Puga previously engaged in unconsented sex with another sleeping female in 2008. *See* Ariz. R. Evid. 404(c). The jury convicted Puga of one count of sexual assault with two enhancing circumstances.

¶14          At sentencing, the State introduced, and the court admitted, Puga's five prior felony convictions, including the 2008 conviction for attempted kidnapping with a sexual motive of Jamie (a pseudonym). The court considered the presentence report, including a victim impact statement from Michelle, a supplemental presentence report, and a statement from Puga. Both Michelle and Jamie offered oral statements.

¶15          The court found Puga "pose[d] a risk to the community" and aggravation significantly outweighed mitigation. As aggravating factors, the court found: (1) emotional harm to the victim; and (2) Puga's prior felony convictions, including the 2008 offense involving Jamie. The court found that Puga caused significant emotional harm to Michelle and gave great weight to this factor. It also gave weight, despite its age, to the 2008 conviction because the offense was "of a similar nature."

¶16          As mitigating factors, the court found Puga's employment and family and community support. The court noted Puga committed this offense, and other felony offenses, while on community supervision or

shortly after release from prison. The court sentenced Puga to 22 years in prison.

**¶17**         Puga timely appealed. We have jurisdiction. *See* Ariz. Const. art. VI, § 9 and A.R.S. §§ 12-120.21(A)(1), 13-4031, and 13-4033(A).

## DISCUSSION

**¶18**         On appeal, Puga argues the superior court should have struck Juror 6 and Juror 10 for cause. Puga also argues the superior court should not have considered Jamie's victim impact statement at sentencing.

### I.     Juror 6

**¶19**         Puga insists the superior court erred in failing to strike Juror 6 for cause because there were reasonable grounds to believe Juror 6 could not be fair and impartial when "[b]alancing Juror 6's experiences, initial comments, apparent reaction to questioning, and the manner in which the assurances were obtained." But that conflates two distinct issues: first, whether the court's questioning was improper, and second, whether the court erred when it denied his motion to strike Juror 6.

#### A.     Questioning of Juror 6

**¶20**         "When a defendant fails to object to trial error, he forfeits appellate relief absent a showing of fundamental error." *State v. Escalante*, 245 Ariz. 135, 138, ¶ 1 (2018). Thus, if the court strays into leading questions or otherwise runs afoul of the guidance in Rule 18.5(f) and its comment, defense counsel must object in real time. Ariz. R. Evid. 103(a); *see also* Ariz. R. Evid. 1101(b) (Arizona Rules of Evidence "apply generally to criminal cases and proceedings."). Because Puga did not object in real time to the court's questioning of Juror 6, we review only for fundamental error. *See Escalante*, 245 Ariz. at 138, ¶ 1.

**¶21**         In a post-peremptory world, we must account for the different roles of court and counsel. The superior court oversees jury selection and it must "conduct a thorough oral examination of the prospective jurors and control the voir dire examination." Ariz. R. Crim. P. 18.5(f). That thorough oral examination includes, "when feasible . . . permit[ting] liberal and comprehensive examination by the parties." 2022 Comment to Rule 18.5(f). As part of a "comprehensive examination," the court should ask open-ended, non-leading questions to "elicit [relevant] information from the subject juror." *State v. Colorado*, 256 Ariz. 97, 102, ¶ 21 (App. 2023).

¶22          Our supreme court advised that courts should not pursue rote, unequivocal assurances of impartiality to rehabilitate prospective jurors. 2022 Comment to Rule 18.5(f). But when a prospective juror gives unclear or qualified answers on impartiality, Rule 18.5 authorizes the court to clarify the answers. The court should exercise caution when clarifying.

¶23          Puga and the dissent contend that the court improperly rehabilitated Juror 6 using leading questions. A leading question suggests the desired answer: "The cat was black, wasn't it?" *State v. McKinney*, 185 Ariz. 567, 575 (1996). Unlike that question, the court asked Juror 6: (1) to "tell us a little more about what happened to you as a child"; (2) "I'll ask you a question, and if the answer is the same, that's perfectly fine. We just want you to be as honest as you can . . . Would you be able to set aside that experience and not let that impact you?"; and (3) "[a]nd not to keep following up on that, but mights and maybes are difficult for us. We need to have a little bit –- [interrupted by Juror 6]." None of these questions suggest the desired answer. Each is appropriate under Rule 18.5(f).

¶24          The court's open-ended questions sought to clarify, not to rehabilitate. "Rehabilitation" occurs when the court tries to remedy a juror's "preconceived notions or opinions about a case." *State v. Martinez*, 196 Ariz. 451, 459, ¶ 28 (2000); *State v. Acuna Valenzuela*, 245 Ariz. 197, 209, ¶ 24 (2018). Juror 6 gave equivocal or qualified answers to the court's yes-or-no questions: (1) "I don't know, you know, how that will affect me"; and (2) "I think I might, yeah." Those answers do not demonstrate preconceived notions or opinions about the case; if anything, they demonstrate a lack thereof. The court did not ask Juror 6 to change her mind; it merely asked her to give a clear answer. The court did not violate Rule 18.5 in questioning Juror 6.

¶25          Puga also takes issue with the State's questioning of Juror 6, citing Rule 18.5(f). But Rule 18.5(f) guides the court in its questioning, not the parties. And, as noted, the court did not err in its questioning of Juror 6. Because the court did not err, we need not assess prejudice. *Escalante*, 245 Ariz. at 140, ¶ 12 (we reverse for fundamental error only when there is both fundamental error and prejudice from that error).

### B.          Challenge of Juror 6 for cause

¶26          Puga argues that the superior court should have struck Juror 6 for cause. We review the court's ruling on a motion to strike a prospective juror for an abuse of discretion. *State v. Allen*, 253 Ariz. 306, 330, ¶ 41 (2022).

¶27    The superior court must "consider the totality of a prospective juror's conduct and answers given during voir dire," and must excuse a prospective juror if "there is a reasonable ground to believe that the juror . . . cannot render a fair and impartial verdict." Ariz. R. Crim. P. 18.4(b), 18.5(h). "The party challenging a juror for cause has the burden to establish by a preponderance of the evidence that the juror cannot render a fair and impartial verdict." Ariz. R. Crim. P. 18.5(h). The court need not strike a juror for cause "simply because [s]he was the victim of a crime similar to one with which the defendant is charged." *State v. Rose*, 121 Ariz. 131, 140 (1978); *see also Colorado*, 256 Ariz. at 102, ¶ 22. "If the juror's demeanor, conduct, or other factors give the court a reason to disbelieve his or her personal assurances of serving fairly and impartially, the court should strike the juror for cause." *Colorado*, 256 Ariz. at 102, ¶ 22. The superior court "observ[ed] and assess[ed] the juror personally," and we defer to its credibility findings. *Id.* ¶ 23. Because of this deference, we question only whether the record supports the court's findings. *Allen*, 253 Ariz. at 331, ¶ 47.

¶28    Puga is correct that we cannot say what "level of emotional response" necessitates a strike for cause. Longstanding precedent, affirmed by this Court after the abolition of peremptory strikes, requires us to defer to the superior court's credibility determinations when ruling on motions to strike. *Colorado*, 256 Ariz. at 102–03, ¶ 23. Only the superior court is positioned to observe the potential juror, weigh her experiences, answers, and demeanor, and determine whether there is a reasonable ground to believe she cannot render a fair and impartial verdict. *Id.*

¶29    Against that backdrop, Puga asks us to reweigh the superior court's assessment of Juror 6's demeanor and assurances of impartiality. Puga argues that courts should give more weight to a juror's "background and experience" than her demeanor and self-assessments of bias.

¶30    After some debate between the superior court and the parties about Juror 6's emotional state during questioning, the court found Juror 6 exhibited "a slight emotional response," along with "a slight change in her tone of voice." The question for the superior court was whether Juror 6's slight emotional response presented a reasonable ground to believe she could not render a fair and impartial verdict given her verbal assurances.

¶31    The superior court did not abuse its discretion. The record contains no evidence that Juror 6 would be unable to render a fair and impartial verdict. It showed only that Juror 6 was the victim in a similar incident. But Juror 6 continually affirmed that she did not think her past

experience would affect her current ability to render a fair and impartial verdict. She maintained this position throughout questioning by the court and by both parties. The superior court found that Juror 6 "clarified sufficiently and clearly that she can be fair and impartial and that her prior experience would not impact her." The record contains reasonable evidence in support. Juror 6 left no reason for the court to question her personal assurance of serving fairly and impartially. *See Colorado*, 256 Ariz. at 103, ¶ 28. Because we cannot discern, from mere lines of transcript, the indicia of bias of a prospective juror which could lead us to a different conclusion, we must defer to the court's findings. *See id.* at 102, ¶ 23.

¶32        The dissent worries that our deference functionally bars appellate review of superior court voir dire. Not so. We affirm because our review of the record does not lead us to conclude Juror 6 was biased, *and* we defer to the superior court's credibility determination reaching the same conclusion. The dissent's review of the record leads it to a different conclusion. But that is why we defer to the superior court's findings when the record supports them. *Allen*, 253 Ariz. at 331, ¶ 47. Our function is not to re-do the superior court's work when we lack the benefit of observing and speaking to a prospective juror. Rather, we serve to ensure the superior court's decisions are supported by the record, as they were here.

¶33        The same principle addresses the dissent's comparison of the superior court's treatment of prospective juror L.B. with that of Juror 6. "Trial courts observe and assess the juror personally, while we only read a record." *Colorado*, 256 Ariz. at 102, ¶ 23. Our review of a cold transcript does not allow us to look a prospective juror in the eye or hear her tones of voice. The superior court, after assessing what it could see and what it could hear, determined that L.B. could not serve but believed Juror 6's unambiguous affirmation of impartiality. The record supports both decisions.

¶34        The court did not abuse its discretion in denying Puga's motion to strike Juror 6.

## II.    Juror 10

¶35        Puga challenges the court's ruling on Puga's motion to strike Juror 10 for cause, which we review for an abuse of discretion. *Allen*, 253 Ariz. at 330, ¶ 41. Puga again asserts that a juror's demeanor and her assurances of impartiality are not "reliable indicators of bias," so the court should give more weight to a juror's experiences and background. Through this lens, he argues that Juror 10's assault experience was so similar to the facts of this case that she could not render a fair and impartial verdict,

despite her stated assurances of impartiality and lack of a "strong emotional response."

**¶36**        The record had no evidence that Juror 10 would be unable to render a fair and impartial verdict. It showed only that Juror 10 was the victim in a similar incident. Like Juror 6, Juror 10 repeatedly and unequivocally affirmed that she believed she could be fair and impartial despite her similar experience. And the record reflects that the court analyzed the totality of Juror 10's conduct in accordance with Rule 18.5(h) when denying the motion to strike.

**¶37**        Puga contends that a victim's past experience should automatically disqualify a prospective juror. Not so. Arizona law prevents crime victims from being disqualified as potential jurors based on their crime-victim status alone. *See Rose*, 121 Ariz. at 140. This principle remains intact after the abolition of peremptory challenges. *See Colorado*, 256 Ariz. at 103, ¶¶ 24–29 (holding that it was not an abuse of discretion to empanel a juror who had experienced domestic violence in a domestic violence murder case). Other than Juror 10's status as a victim of a similar crime, Puga points to nothing in the record—and we can identify nothing— undermining the court's finding that Juror 10 could render a fair and impartial verdict.

**¶38**        The court did not abuse its discretion in denying Puga's motion to strike Juror 10.

## III.    Sentencing

**¶39**        Puga argues the superior court erred by considering Jamie's victim impact statement during sentencing. Noting that Jamie was a victim of a prior felony for which Puga has completed the terms of his sentence, he argues that Jamie did not have a right to speak at sentencing. Puga contends that consideration of her statement violated his right to due process because it was not relevant to any aggravating factor and exposed him to "double punishment" for his prior felony. Because Puga did not object to Jamie's statement at sentencing, we review the court's decision to consider that statement for fundamental error. *Escalante*, 245 Ariz. at 140, ¶ 12.

**¶40**        Section 13-4426(A) affirmatively allows the victim of the crime charged to speak at sentencing. And it does not explicitly *prohibit* victims of prior crimes from speaking at sentencing for new crimes perpetrated by the same defendant.

¶41     The superior court did not violate Puga's right to due process by considering Jamie's statement. In fact, the sentencing code compelled the superior court to consider felony convictions less than ten years old as an aggravating circumstance. A.R.S. § 13-701(D)(11); *State v. Romero*, 173 Ariz. 242, 243 (App. 1992) ("We take the statute to mean the court *must* consider convictions that are less than ten years old."). Although Puga's felony conviction for his crime against Jamie was twelve years old, "the sentencing statute does not preclude the use of an older felony conviction in aggravation." *State v. Calderon*, 171 Ariz. 12, 14 (App. 1991).

¶42     Moreover, Jamie's statement was relevant during sentencing. Rule 26.7(b)(2) permits any party to "introduce any reliable, relevant evidence, including hearsay, to show aggravating or mitigating circumstances" at the presentencing hearing. Section 13-701(D)(27) permits the superior court to consider "[a]ny other factor that the state alleges is relevant to the defendant's character or background or to the nature or circumstances of the crime." Puga argues Section 13-701(D)(27) relates only to "the crime for which the court is imposing sentence." But "[t]he trial court should consider not only the offenses charged, but also the past conduct and moral character of the defendant so that the punishment may fit both the offense and the offender." *State v. LeMaster*, 137 Ariz. 159, 165 (App. 1983). And "it is appropriate for the trial court to consider the objectives of sentencing, namely, retribution, restraint, deterrence and rehabilitation." *Id.* Here, Jamie's statement was relevant because it helped explain the circumstances of Puga's 2008 conviction and it informed the "restraint, deterrence and rehabilitation" objectives of sentencing.

¶43     The court did not violate Puga's due process rights, and it was within its prerogative to consider Jamie's statement.

## CONCLUSION

¶44     We affirm Puga's conviction and sentence.

**J A C O B S, J., specially concurring in part and dissenting in part:**

¶45     This appeal concerns how for-cause strikes work after the Arizona Supreme Court's abolition of peremptory challenges. While abolishing peremptory strikes, our supreme court changed our voir dire procedures. Ariz. R. Crim. P. 18.4, 18.5. Defendant Robert Puga appeals his conviction for sexual assault, arguing the superior court erred by not striking either of two prospective jurors for cause. I concur with my

colleagues that there was no reasonable ground to believe Juror 10 could not render a fair and impartial verdict. But because voir dire showed there was a reasonable ground to believe Juror 6 could not render a fair and impartial verdict, the superior court was required to excuse her from service under Arizona Rule of Criminal Procedure 18.4(b). I therefore respectfully dissent in part and would reverse Puga's conviction and remand for a new trial. Because a conviction in a new trial would require a resentencing, this dissent does not address the due process issue Puga raises concerning his sentencing.

## FACTS AND PROCEDURAL HISTORY

### A.  The Court and the Parties Conducted Voir Dire Mindful of an Approaching Snowstorm and the Low Number of Prospective Jurors on Hand.

¶46        During voir dire, the court and counsel repeatedly expressed concern about empaneling a jury from the relatively low number of prospective jurors on hand, given the hardship imposed on many by a coming storm. Thus, when the defense asked early in the voir dire that one juror be excused for cause or hardship, the court responded that "I am very mindful of the fact that we have 29 [prospective jurors] total. We're in the middle of a big storm coming. And unless it's absolutely clear from the questioning that someone is not available, I'm not inclined to strike them until there is some follow-up question that makes that clear." The court added, "[s]o we will hold off, then, on striking [a prospective juror] – or excusing her for hardship at this time." Counsel for the State echoed this concern after more jurors were excused, stating of voir dire, "I'm being a little more conservative now because I see that we could be in trouble with the number of jurors."

¶47        As part of voir dire, the court asked all potential jurors whether they had experienced anything like the facts of this case that might impact them. Based on what it learned, the court conducted voir dire of five prospective jurors about sexual assault outside the presence of other prospective jurors. Two, Juror 6 and Juror 10, were sexual assault victims. Three others, Juror 9, and prospective jurors LB and DV, were people who knew or were related to persons who experienced, or claimed to have experienced, sexual assault. The court excused for cause two of the three who were not sexual assault victims. It empaneled Juror 6 and Juror 10, who were sexual assault victims, as well as Juror 9, who had two family members who were sexual assault victims. The court examined the jurors in the following sequence.

**B.** **The Court Strikes Two Jurors For Cause After Examination About Sexual Assault Issues, but Not Three Others, Including Juror 6.**

**1.** **Voir Dire of Juror 10, Not Excused**

¶48 Juror 10 asked to speak privately with the court and counsel and revealed she had been sexually assaulted 20 years ago. Juror 10 stated she had gone to therapy and did not believe the experience would affect her ability to be impartial. Juror 10 stated she believed "a jury of your peers includes people that have been sexually assaulted." Juror 10 explained there was no criminal case that resulted from her experience, and that she did not blame the authorities. When defense counsel asked her if she felt she could be impartial, Juror 10 responded affirmatively.

¶49 Defense counsel moved to strike Juror 10 for cause, arguing her experience was like the alleged incident and suggesting Juror 10 might thus identify with the victim in this case. The State countered that Juror 10 repeatedly expressed she could be fair, arguing "if they come in and say, I can be fair and impartial, I'm going to judge the matter neutrally, then I think we're good to go." The court noted Juror 10's demeanor did not suggest any strong emotional response to the questions or her answers. The court explained that Juror 10's sexual assault occurred 20 years ago and that she received therapy. Relying on Juror 10's averrals of impartiality, the court found "no indication that there is a basis to strike for cause" and seated her.

**2.** **Voir Dire of Prospective Juror DV, Stricken For Cause**

¶50 Prospective Juror DV explained that his daughter, while in high school, had a friend she was not dating attempt to reach down the front of her pants. DV's daughter was able to stop the incident. It was not captured by school surveillance cameras, leading the family not to pursue the matter further. The court asked "can you feel that impacting you in any way with this case and the allegations?" DV said he "would like to say no," but explained it was his child and he "wouldn't want that to happen to anyone else's child." The court then asked if DV would "be able to set that aside and just listen to the testimony and the evidence in this case and judge that fairly and impartially without having what happened to your daughter influence your opinion of any of that testimony?" DV agreed: "I would say yes," explaining why with reference to his life experience.

¶51        The State's lawyer pushed DV further.  He asked whether DV could "evaluate every witness's testimony fairly."  Again, DV answered unequivocally – "I believe so."  The State's lawyer then asked DV again if he would be fair and impartial, this time asking him for a perfect assurance of the correctness of his answer:

> But we've just got to make sure.  Like this is one where we can't be like 99 percent.  We've got to be a hundred percent sure out of interest for the fairness of the proceedings.  We got to make sure that you can set aside what happened to your daughter and judge this case fairly and impartially, thinking, for example, of like who you'd want on the jury if you stood accused of such a crime.  All we need to know is can you be fair and impartial.

¶52        DV broke.  "I would like to say yes, but honestly, I'd probably not be, in all honesty," he responded.  The State requested that DV be struck for cause.  The defense agreed, and the court found good cause, striking DV.

### 3.        Voir Dire of Juror 9, Not Excused

¶53        Juror 9 explained to the court that there were several experiences of sexual assault in her family.  Her sister, at the age of 6, was victimized along with others by a teenaged boy who made "them do things."  That same sister when aged "15ish[] was involved with a 21-year-old," resulting in charges and imprisonment of the 21-year-old "for a few years."  Finally, Juror 9's brother-in-law was sexually assaulted by his father, resulting in imprisonment for life.  Juror 9's only involvement with these situations was catching her sister as a teen with her older boyfriend, and later, coming to court in the related criminal matter.

¶54        The court's first and only question was the ultimate one: "[t]hese experiences of your family members, would that impact or affect your ability to judge fairly and impartially the evidence in this case?"  Juror 9 answered, "[n]o."  In response to the State's repetition of whether Juror 9 could "set aside those issues . . . and just judge this case fairly and impartially," Juror 9 responded, "[h]undred percent."  Juror 9 offered more averrals of her impartiality and no equivocal statements.  No party moved to strike her for cause.  The court seated her.

### 4. Voir Dire of Prospective Juror LB, Stricken For Cause

¶55 Prospective Juror LB reported that her son's ex-girlfriend had been sexually assaulted. The court first asked the ultimate question: whether that experience of your son's ex-girlfriend, "would impact your ability to be fair and impartial at all?" LB answered that she did not think so. The court asked LB why. LB explained the ex-girlfriend "did a lot of lies," and had claimed that while working as a delivery person "she got assaulted by the person that she was delivering to." The court asked whether those allegations would lead LB to favor either party, to which LB answered "[t]hat I'm not – I'm still not sure because – I'm not sure."

¶56 Neither party had any follow-up questions. Both agreed LB should be removed for cause, though the record reflects no explanation as to why. The court agreed and removed LB for cause.

### 5. The Court Questioned Juror 6, Likewise a Sexual Assault Victim, Eliciting Equivocal and Conflicted Responses About Fairness.

¶57 By the time the court questioned Juror 6, it had excused 6 jurors for cause or hardship (AP, RB, LB, DV, TB, and MB). Juror 6 indicated in open court she had experienced something "similar" to the sexual assault in this case and, apologizing, asked to speak to the court about it privately. In chambers with counsel, Juror 6 revealed that in 1958, when she was nine, a caregiver exposed himself to her and tried to place her hands on his body. No charges followed, although Juror 6 explained the caregiver was "asked to leave town. That's the way things were done then, you know."

¶58 Before the court asked follow-up questions, Juror 6 volunteered, "[s]o I don't know, you know, how that would affect me, but you just don't – you don't know." The court began its voir dire by asking "I'll ask you a question, and if the answer is the same, that's perfectly fine. We just want you to be as honest as you can. Would you be able to set aside that personal experience and not let that impact you?" Juror 6 responded, "I think I might, yeah." After that equivocal answer that leaned mildly toward yes, the court then sought a more definitive answer: "[a]nd not to keep following up on that, but mights and maybes are difficult for us. We need to have a little bit –[.]" Juror 6 replied, "[y]eah. Yeah. I feel pretty confident, yeah, that I would be able to be okay with that. Yeah." Juror 6 then added that the experience was "a long time ago" and that her parents "handled [it] well."

14

¶59 In follow-up questioning, the State's counsel emphasized the trial concerned adults, not children. Juror 6 agreed, "[r]ight. Makes a difference." The State also asked for certainty, couching the request in terms of whether the juror would follow the judge's lead: "we need to know for sure that you can listen to the evidence in this case and decide the facts of this case based on the instructions Judge Krueger gives you. We've got to have a hundred percent on that[,] that you can do that here. Do you feel like you can do that here?" "I do[,]" answered Juror 6. When defense counsel asked Juror 6 if the prior incident would affect her, Juror 6 replied, "I don't think so." Juror 6 then denied that her experience would "affect her opinion" in the trial or lead her to favor either side.

¶60 Juror 6 experienced an emotional reaction as she related her experience of sexual assault. Moving to strike her for cause, defense counsel averred that "[s]he was moved to tears when she was talking about her incident," continuing, "[a]lthough she may have said that she would remain fair and impartial, her body language and voice and actions here today show that she would not." The court stated that it observed no crying. After the State's lead counsel agreed Juror 6 did not cry, the State's own co-counsel averred that "[a]ll I saw was her eyes get more glassy, but I didn't see any tears."

¶61 After the State's concession that Juror 6's eyes moistened, the court noted Juror 6 "did have a slight emotional response" and there "was a slight change in her tone of voice" when she described the event. Ruling on the defense motion to strike Juror 6 for cause, the court summarized Juror 6's initial answer incorrectly, stating "[s]he did provide an answer initially that she might be able to be fair and impartial, that she didn't think that this would impact her at all[,]" though Juror 6's initial answer concluded "I don't know, you know, how that would affect me, but you just don't – you don't know." The court then correctly noted Juror 6's later averrals of fairness and impartiality and denied the motion to strike her for cause.

¶62 The jury that included Juror 6 heard evidence over three days – February 28, March 2, and March 3, 2023. The jury convicted Puga of one count of sexual assault with two enhancing circumstances. The court sentenced Puga to 22 years in prison.

## DISCUSSION

**¶63** Puga argues the court erred by seating Juror 6. He argues juror experiences – here, Juror 6's sexual assault – are more important than demeanor or assurances of impartiality. Separately, he argues the court did not properly account for Juror 6's initial, equivocal statement about how being an assault survivor might affect her and then prompted her to provide assurances of fairness and impartiality. The State emphasizes the assurances of fairness the court elicited. The State notes that the court referred to Juror 6's demeanor while denying the motion to strike, but other than urging deference to trial courts, does not offer any analysis or argument as to how Juror 6's acknowledged emotional response did not indicate some bias. Finally, the State argues that the fact of being a sexual assault victim is not by itself disqualifying.

**¶64** We defer to the trial court's findings of fact, unless they are clearly erroneous. *Shooter v. Farmer*, 235 Ariz. 199, 200 ¶ 4 (2014). We review legal issues, including the interpretation or application of a procedural rule, de novo. *See Voice of Surprise v. Hall*, 255 Ariz. 510, 513 ¶ 11 (2023); *see also Angelica R. v. Popko*, 253 Ariz. 84, 88 ¶ 10 (App. 2022) (reviewing the court's ruling for abuse of discretion but analyzing the interpretation of a procedural rule de novo). The Opinion is correct that we review for abuse of discretion whether the court erred in failing to strike a juror for cause. *State v. Allen*, 253 Ariz. 306, 330 ¶ 41 (2022). But if there is an abuse of discretion, we review for harmless error. *State v. Montoya*, 129 Ariz. Cases Dig. 7 ¶ 72 (Aug. 15, 2024) ("Because defense counsel objected to [the empanelment of a juror], we review any error for harmless error.").

I.   **With Peremptory Challenges Abolished, the Rules and a New Comment Direct the Court to Conduct Searching, Open-Ended Questioning, Focusing on Potential Bias, Rather Than Rehabilitating Jurors Through Conclusory Questions.**

**¶65** As before the abolition of peremptory challenges, Arizona Rule of Criminal Procedure 18.4(b) governs challenges for cause and requires courts to decide whether "there is a reasonable ground to believe . . . the juror . . . cannot render a fair and impartial verdict." Ariz. R. Crim. P. 18.4(b). This is what the former comment to Rule 18.4(b) called "the essential question – whether a juror can try a case fairly." Ariz. R. Crim. P. 18.4(b) cmt. (2021). And, as before the abolition of peremptory challenges, Arizona Rule of Criminal Procedure 18.5 provides detailed guidance for how to conduct voir dire of prospective jurors. When voir dire reveals a "reasonable ground" to believe a juror cannot try a case fairly, "[t]he court, on motion or on its own, must excuse" that juror. Ariz. R. Crim. P. 18.4(b).

**¶66**      But while much remains the same in Rules 18.4 and 18.5, much has changed.   The Arizona Supreme Court's repeal of the longstanding comment to Rule 18.4(b) has removed the litany of narrow-bore examples of different types of bias that justified striking jurors, many of which dated back to the Howell Code's enactment in 1864.  *Compare* Howell Code, ch. XI, §§ 319, 320, 322 (1864) *with* Ariz. R. Crim. P. 18.4(b) cmt. (2021).  This leaves the court to focus on the basic, core question of whether a prospective juror exhibits bias in any way.

**¶67**      And while it remains true that the court "must conduct a thorough oral examination of the prospective jurors and control the voir dire examination[,]" Ariz. R. Crim. P. 18.5(f), the Arizona Supreme Court has now explained what should happen in that thorough oral examination. *See* Ariz. R. Crim. P. 18.5(f) cmt. (2022).  With peremptories gone, "the court should permit liberal and comprehensive examination . . . and use open-ended questions that elicit prospective jurors' views narratively." *Id.*  Our supreme court has likewise explained what should *not* happen in voir dire: "[t]he court should refrain from attempting to rehabilitate prospective jurors by asking leading, conclusory questions that encourage prospective jurors to affirm that they can set aside their opinions and neutrally apply the law." *Id.*

**¶68**      The Arizona Supreme Court's 2022 amendments to Rule 18.5 also direct our courts not to give undue weight to conclusory affirmations of impartiality that the comment to Rule 18.5(f) warns courts not to elicit in the first place.  *See* Ariz. R. Crim. P. 18.5(f) cmt. (2022).  Amended Rule 18.5(h) requires a court, in determining whether a juror can render a fair verdict, to "consider *the totality of a prospective juror's conduct and answers given during voir dire[,]*" thus preventing a court from treating such affirmations as analysis-ending talismans.   Ariz. R. Crim. P. 18.5(h) (emphasis added).

**¶69**      The Opinion declines to follow these new rules and their comment because (1) after the court asked Juror 6 a leading, conclusory question that signaled she was supposed to aver she could set aside her bias; (2) and she eventually – after further direction to her that "might" wasn't enough – gave the requested assurance that she could set aside her bias and be fair and impartial; (3) that assurance was "reasonable evidence" the juror could not be biased, foreclosing any possibility that seating her was an abuse of discretion.  *See* Opinion ¶¶ 23-24, 29-31, *supra.*

**¶70**      It is true we used to say the court need not excuse a juror who assures the court of her ability to be fair and impartial.  *See State v. Smith*, 182 Ariz. 113, 115 (App. 1995); *State v. Reasoner*, 154 Ariz. 377, 384 (App.

1987).  But if the Opinion's adherence to that maxim holds despite the 2022 amendments and the related comments, then courts remain free to ask conclusory, leading questions that obtain averrals the 2022 comment to Rule 18.5(f) suggests are misleading or valueless.  According conclusive, conversation-ending force to the prospective juror's recitation that they can set aside their experience and be fair stops us from reviewing the totality of the record to decide whether there are "reasonable grounds" to believe the juror could not set aside their bias.  But that's what Rule 18.4(b), Rule 18.5(h), and the comment to Rule 18.5(f) require.

¶71          Applying these recently amended rules and one of their comments to the totality of the voir dire at issue, I would find empaneling Juror 6 was error requiring reversal for a new trial, while recognizing that the court properly empaneled Juror 10.

II.      **The Court Abused Its Discretion by Empaneling Juror 6, Given the Court's Questioning, the Totality of Juror 6's Conduct and Answers, the Court's Mistaken Understanding of What Juror 6 Said, and the Striking of Another Juror For Cause for Less.**

     A.      **The Questioning of Juror 6 Was Contrary to the Guidance in the Comment to Recently-Amended Rule 18.5(f).**

¶72          While certainly historically normal and consistent with our courts' longstanding voir dire practice, the questioning of Juror 6 did not follow the guideposts of recently-amended Rule 18.5.  The court asked Juror 6 in chambers to give more information about her sexual assault.  Juror 6 explained how as a nine-year-old, her caregiver exposed himself to her and tried to put her hands on his body.  Having described her ordeal, Juror 6 then volunteered, unprompted, "[s]o I don't know, you know, how that would affect me, but you just don't – you don't know."

¶73          Contrary to the Opinion's view that it did no such thing, the court then posed a leading, closed-ended request for an affirmation of impartiality the comment to Rule 18.5(f) says courts should not use: "[w]ould you be able to set aside that personal experience and not let that impact you?" *See* Ariz. R. Crim. P. 18.5(f) cmt. (2022) (warning that "[t]he court should refrain from attempting to rehabilitate prospective jurors by asking leading, conclusory questions that encourage prospective jurors to affirm that they can set aside their opinions and neutrally apply the

law[]").[1]   When Juror 6's response was the clearly equivocal, "I think I might, yeah," the court declined to take "might" for an answer.  The court pressed further: "[o]kay.  And not to keep following up on that, but mights and maybes are difficult for us.  We need to have a little bit –[.]"  Thus prompted by the court, Juror 6 finally gave an answer less suggestive of bias, "[y]eah.  Yeah.  I feel pretty confident, yeah, that I would be able to be okay with that, yeah."  I agree with the Opinion that a "leading question suggests the desired answer."  *See* Opinion ¶ 23, *supra*.  But this colloquy did "suggest[] the desired answer."  After a mildly positive lean from Juror 6, the court told her "[w]e need" an unequivocal, affirmative response, and obtained one.   That is the opposite of open-ended and non-leading questioning.

**¶74**        While the comment to Rule 18.5(f) states, "[w]hen feasible . . . the court should . . . use open-ended questions that elicit prospective jurors' views narratively[,]" as the court did with Juror 10, the questioning of Juror 6 was different.  The comment warns "[t]he court should refrain from attempting to rehabilitate prospective jurors by asking leading, conclusory questions that encourage prospective jurors to affirm that they can set aside their opinions and neutrally apply the law."  *Id.*  The court did rehabilitate Juror 6, using questions that were closed-ended, leading, sought certainty, and asked her to "set aside" her experience.  This is the classic script our trial judges have been encouraged to use for decades, making its use understandable.  Yet it is also one the new rules teach they ought not use.

**¶75**        Just as the comment to Rule 18.5(f) suggests, the assurance thus obtained was of dubious value.  The State's follow-up voir dire, which the court supervises under Rule 18.5(f), was more of the same.  The State's lead counsel did not engage in open-ended questioning, but asked a closed-ended question demanding assurances of perfect impartiality, framed in terms of obeying the judge's instructions:  "we need to know that you can listen to the evidence in this case and decide the facts of this case based on

---

[1] The Opinion suggests the court moved directly from appreciating candor and urging honesty to asking "Would you be able to set aside that personal experience and not let that impact you?"  Opinion ¶ 7, *supra*.  Not so.  After complimenting Juror 6's candor and urging honesty, the court said, "You're going to be instructed, of course, that you can only consider the evidence and the testimony during trial.  Would you be able to set aside that personal experience and not let that impact you?"  The context of this question was the court stating the rule that jurors must obey instructions, and then asking *in that light* if she could "set aside that personal experience and not let that impact [her]."

the instructions that Judge Krueger gives you. *We've got to have a hundred percent on that*[,] *that you can do that here*. Do you feel like you can do that?" (Emphasis added). Thus strong-armed, and in contradiction to her prior equivocation, Juror 6 complied: "I do." But that ultimate response to this leading, closed-ended question borders on meaningless. *See* Ariz. R. Crim. P. 18.5(f) cmt. (2022).

¶76 The mere fact of using closed-ended questions resulting in simple confirmations of impartiality does not make the outcome of a voir dire invalid. If there are no significant reasons to question whether a juror might be biased, the totality of the record will show there is no reasonable basis to believe that juror cannot render a fair verdict. *See* Ariz. R. Crim. P. 18.4(b). When the court or the parties employ other questions in addition to conclusory ones, the confirmations will form part of "the totality of a prospective juror's conduct and answers given during voir dire" the court will use in assessing a challenge for cause. Ariz. R. Crim. P. 18.5(h). And when a juror provides information that suggests a lack of bias, whether through jury questionnaires or other means, the record will support a decision to empanel them.

¶77 But when courts employ conclusory, leading questions that affirmatively request and obtain confirmations of impartiality, *but the totality of the record gives some reason to believe the juror cannot render an impartial verdict*, seating that juror is an abuse of the court's discretion. It is true that the court's and the State's questions eventually led Juror 6 to give assurances of her impartiality. But that only occurred by asking questions contrary to the direction of Rule 18.5(f)'s comment that those conclusory assurances are not entitled to the conversation-stopping force we once accorded attestations of impartiality. Put another way, the Arizona Supreme Court didn't tell courts to stop seeking conclusory attestations from balky jurors because they were supposed to be the end of the story. Given the other problems with Juror 6's impartiality in this record, they should not have been the end of the story here.

¶78 In its discussion of these issues, the Opinion starts in the right direction. It correctly agrees that "[o]ur supreme court advised [in the comment to Rule 18.5(f)] that courts should not pursue rote, unequivocal assurances of impartiality to rehabilitate prospective jurors." Opinion ¶ 22, *supra*. But then the Opinion veers off-course, suggesting the court's examination complied with Rule 18.5 and its comment because the superior court was engaged in "clarification" that was not "rehabilitation." Opinion ¶¶ 22-25, *supra*. That distinction does not hold, and thus offers no path around Rule 18.5 here.

**¶79** *State v. Fournier* makes this point. 256 Ariz. 33, 40 ¶¶ 11-12 (App. 2023), *review denied*, *paragraphs 19-21 depublished on other grounds*, ___ Ariz. ___, 543 P.3d 1034 (March 5, 2024). There, we described the superior court's requests for clarification that saved a juror's participation in the jury as "asking questions to rehabilitate the juror." *Id.* at ¶ 12. First, the court clarified with a juror that prior questioning in the voir dire was "kind of a trick question." *Id.* at ¶ 11. We then wrote that "[t]he court further clarified the question and asked, [i]f no facts were presented, what other verdict could you have?" *Id.* (internal quotations omitted). We were right to describe this colloquy in *Fournier* as both clarifying and rehabilitating: to rehabilitate a witness is to make clear something of substance they must say that they have not previously said (at least not clearly). *Id.* at ¶¶ 11-12. And the Opinion suggests no purpose in the court's "clarifications" here save preserving the prospective juror's participation, as in *Fournier*. Opinion ¶¶ 22-25, *supra*; *see also State v. Payne*, 233 Ariz. 484, 498 ¶ 16 (2013) (referring to Rule 18.5(d)'s language permitting "further oral examination" as providing an "opportunity to rehabilitate"). The superior court's examination of Juror 6 elicited assurances that she could set aside her feelings after all and be objective, which was rehabilitation.

**¶80** If Puga's appeal was one that objected solely to the court's questioning as in violation of Rule 18.5(f) and its comment, I would agree that we could affirm. But atomizing Puga's appeal into two questions – whether Puga preserved objections to the court's questions of Juror 6, and separately, whether the court abused its discretion by denying the motion to strike her for cause, *see* Opinion ¶¶ 20, 31, *supra* – ignores the organic way in which questioning and answers in voir dire are part of the for-cause challenge Puga made and preserved. This Dissent addresses that relationship next.

> **B.** **The Totality of Juror 6's Conduct and Answers, Which Rule 18.5(f) Requires Us to Analyze, Shows There Was a Reasonable Ground to Believe Juror 6 Could Not Render a Fair Verdict, Making Empaneling Her Error.**

**¶81** The Opinion argues that we must defer to the superior court's credibility determinations because "[o]nly the superior court is positioned to observe the juror, weigh her experiences, answers, and demeanor, and determine whether there is a reasonable ground to believe the juror cannot render a fair and impartial verdict." Opinion ¶ 28, *supra* (citing *State v. Colorado*, 256 Ariz. 97, 103 ¶ 23 (App. 2023)). The Opinion argues for deference, claiming it is simply not our job to judge whether there was a reasonable basis to believe a juror could not render a fair and impartial verdict because we could only do so from our review of a transcript.

Opinion ¶¶ 28-32, *supra*. It states: "we cannot discern, from mere lines of transcript, the indicia of bias of a prospective juror which could lead us to a different conclusion[.]" Opinion ¶ 31, *supra*. It continues, "[o]ur review of a cold transcript does not allow us to look a prospective juror in the eye or hear her tones of voice." Opinion ¶ 33, *supra*. Having determined that we have no choice but to defer, and no means at hand from which we might reach a contrary conclusion, the Opinion finds that "reasonable evidence" of a lack of bias requires affirmance here. Opinion ¶¶ 31-32, *supra*. The Opinion thus holds, notwithstanding the 2022 amendments, that voir dire merely requires a conclusory averral of impartiality at its end, as before, foreclosing further analysis. *See Smith*, 182 Ariz. at 115; *Reasoner*, 154 Ariz. at 384.

**¶82**        These mistaken premises lead the Opinion to its incorrect outcome. Rules 18.4(b) and Rule 18.5(h), taken together, require us to consider from the totality of the record whether the superior court abused its discretion, and with skepticism about the rote rehabilitation-and-setting-aside exercise.

**¶83**        When we "consider the totality of [Juror 6's] conduct and answers given during voir dire[,]" there is "a reasonable ground to believe that" Juror 6 "cannot render a fair and impartial verdict." Ariz. R. Crim. P. 18.4(b), 18.5(h). The totality of conduct and answers here extend far beyond the assurance of likely neutrality that was provided only in response to a question closely tracking the one advised against in the recently-enacted comment to Rule 18.5(f). *See* Ariz. R. Crim. P. 18.5(f) cmt. (2022). Dismissing the transcripts that make up that totality as "mere" and "cold," and thus incapable of supplying evidence of a "reasonable ground" under Rule 18.4(b), is at odds with Rule 18.5(h), and is a thumb we are not allowed to place on the scale. Opinion ¶¶ 31-32, *supra*. Put another way, the transcripts are much of what we have to work with. If we cannot use their content to review the propriety of the superior court's analysis of "the totality of a prospective juror's conduct and answers given during voir dire[,]" as the Opinion suggests, we are functionally barred from reviewing the superior court's decision. *Compare* Ariz. R. Crim. P. 18.5(h).

**¶84**        A major problem with relying on Juror 6's attestations of impartiality is that her emotional reaction to discussing her sexual assault suggests potential bias on her part. The record here is telling. At first, there was no reflection on the record of Juror 6's emotional reaction to discussing her sexual assault. Then defense counsel claimed "[s]he was moved to tears." The State's lead counsel jumped in, objecting to the statement about tears, repeating that he did not see tears and "the [c]ourt didn't see it either." At that point, the State's other counsel interjected that she "saw her

22

eyes get more glassy, but [she] didn't see any tears." Notably, the State raised Juror 6's emotional reaction while opposing the motion to strike her. That concession is a statement against interest, which, in other legal contexts, we treat as an indication of its reliability. *See* Ariz. R. Evid. 804(b)(3) (setting forth statements against interest as one exception to rule against hearsay).

¶85 After the State's concession that Juror 6's eyes got moist, and in apparent response to one counsel's claim the court did not see any tears, the court acknowledged Juror 6 "did have a slight emotional response." In terms of what the court noted "was a slight change in her tone of voice when she was describing what occurred." Thus, setting the defense aside, *the court and the State* acknowledged Juror 6's emotional reaction in her voice and moist eyes. The Opinion also acknowledges that the court found a "slight emotional response" and "slight change in her tone of voice." Opinion ¶ 30, *supra*.

¶86 The court's factual error in relying on a misunderstanding or mishearing of Juror 6's initial remarks provides a further basis to reverse. In denying Puga's motion to strike Juror 6 for cause, the court stated, "[s]he did provide an answer initially that she might be able to be fair and impartial, that she didn't think that this would impact her at all." But that is not what Juror 6 said initially. True, she allowed in her *second* answer to the court that she thought she "might" be able to set her experience aside so it wouldn't affect her. But her first answer, in response to non-leading open-ended questions like those Rule 18.5(f)'s comment urges, was that "I don't know, you know, how that would affect me, but you just don't – you don't know." That unled answer was undeniably equivocal, and the court's misunderstanding of her equivocal statement is a factual error to which we cannot defer. *See Shooter*, 235 Ariz. at 200 ¶ 4.

¶87 But it is really the totality of all of these issues that made empaneling Juror 6 error. Juror 6's history as a sexual assault victim is one factor. Her unled, volunteered uncertainty as to how her history would affect her as a juror is another. That the court rehabilitated and affirmatively requested an assurance of neutrality despite the comment to Rule 18.5(f) is another. Her moist eyes and emotional reaction, admitted by the nonmovant here, is yet another. Putting it all together, there is a "totality" that adds up to reasonable grounds to suspect she might be biased. *See State v. Thornton*, 187 Ariz. 325, 330 (1996) ("If confronted with a challenge for cause in which the facts do not clearly establish whether a prospective juror should be removed, the better practice will be to resolve doubt in favor of disqualification.").

**¶88**        It is more important after the abolition of peremptory challenges to make sure we apply Rule 18.4 and its prohibition of seating jurors for whom there are "reasonable ground[s]" to question their partiality. *See* Ariz. R. Crim. P. 18.4(b). Until 2022, the superior court could justifiably expect the parties to weed out most of the jurors for whom a defendant would argue there was such a "reasonable ground." The Arizona Supreme Court said as much in *State v. Cruz*. 218 Ariz. 149, 159 ¶ 31 (2008) ("We see no fundamental error. When questioned, [a juror] stated that she could be fair and impartial to both sides. [Defendant's] concerns that sympathies based on her husband's former job might influence her decisions exemplify why a defendant is given peremptory strikes: to remove a qualified juror whom the defendant does not wish to have on the jury.").

**¶89**        Now counsel can't do that. Instead, all of the work to avoid potential bias in Arizona's juries occurs through strikes for cause. We must not hold to prior law, since modified by rule changes, and insist that if there is "reasonable evidence" of nonbias from a conclusory attestation, the remainder of the record suggesting bias is unreviewable, so courts may seat arguably biased jurors. We must instead honor the plain language of Rules 18.4(b) and 18.5(f) and employ the concepts of "reasonable ground" and "the totality of a prospective juror's conduct and answers given during voir dire[.]" There was not, as the Opinion would have it, an "unambiguous affirmation of impartiality." Opinion ¶ 33, *supra*. Where the record is more equivocal, the right question is whether there is any reasonable ground to believe Juror 6 could not be fair. Here, there was substantial support for both hypotheses – that she could be fair, and that she could not be. In that situation, to decline to strike Juror 6 was error. That requires reversing this particular conviction and ordering a retrial.

> **C.        Striking Prospective Juror LB For Cause Where There Was Far Less Suggestion of Potential Bias, If Any, Underscores the Error in Declining to Strike Juror 6.**

**¶90**        The error here is underscored by how much more potential bias Juror 6 demonstrated than prospective juror LB, who was stricken for cause earlier in the voir dire. LB was not a sexual assault victim – her connection with sexual assault was her acquaintance with her son's ex-girlfriend, whom she unflatteringly described as doing "a lot of lies." Assuming life history can matter, there was far less reason to think LB would be biased than Juror 6. LB's answer to the court's first question about potential bias was more favorable than Juror 6's. LB said, she didn't think so, to whether her experience would bias her, while Juror 6 was initially repeatedly equivocal. Despite a minimal demonstration of potential bias at

24

most, the court removed LB for cause. If LB's responses demonstrated cause in this voir dire, as the State contended and the defense agreed, then *a fortiori*, the court should also have removed Juror 6.

### D.      The State Did Not Demonstrate the Error Was Harmless.

**¶91**          Because there was an error in seating Juror 6, we cannot affirm Puga's conviction and sentence unless the error was harmless. *Montoya*, 129 Ariz. Cases Dig. at ¶ 72. Under harmless error analysis, the State must prove beyond a reasonable doubt that seating Juror 6 did not contribute to or affect the verdict or sentence. *State v. Henderson*, 210 Ariz. 561, 567 ¶ 18 (2005). The State did not seek to demonstrate that empaneling Juror 6 did not impact Puga's conviction. Because I believe not striking Juror 6 was error, I thus believe the court must vacate Puga's conviction and sentence.

### III.     The Court Did Not Abuse Its Discretion in Seating Juror 10, as Its Voir Dire Complied with Rule 18.5 and Revealed Her Lack of Potential Bias, as the Court Determined Within Its Discretion.

**¶92**          The Opinion is correct that the superior court did not abuse its discretion when it denied his request to strike Juror 10, in light of her history as a sexual assault victim. The superior court complied with Rule 18.5(h) by conducting a "thorough oral examination" of Juror 10. The court's first question after learning Juror 10 had previously been sexually assaulted was the open-ended question "if you wouldn't mind just letting us know what information you want to share," followed up by "when was this, approximately?" After Juror 10 answered the first question by explaining she had done therapy and thought she would not be biased, the court did not immediately seek a rote confirmation that she would be fair and impartial. Instead, the court asked less directly if "you think you would be able to set that aside and not have it be on your mind or front of mind while you're hearing testimony about allegations of sexual assault?" Beyond that, the court supervised a robust, wide-ranging voir dire that did not consist of strong requests for averrals of impartiality and was consistent with amended Rule 18.5 and its comments.[2]

---

[2] *See also* Jessica M. Salerno, et al., *The Impact of Minimal Versus Extended Voir Dire and Judicial Rehabilitation on Mock Jurors' Decisions in Civil Cases*, 45 L. & Hum. Behav. 336 (2021) (explaining that "[e]xtended voir dire," questioning by the parties, and open-ended questions should elicit more candid answers from prospective jurors than the use of "minimal voir dire," questioning solely by the court, and closed-ended questions).

**¶93**　　　　As Rule 18.5 now provides, it is the fullness of what is elicited in voir dire that indicates bias or its absence, not one historical fact, or one conclusory averral.　*See* Ariz. R. Crim. P. 18.5(h) (requiring courts to "consider the totality of a prospective juror's conduct and answers given during voir dire").　Applying that standard here, the State is right that there was no abuse of discretion in empaneling Juror 10.　Juror 10's first, unprompted statement concerning bias was that "I do not believe [my experience with sexual assault] will affect my ability to be impartial."

**¶94**　　　　But more than that, the give and take over five pages of transcript demonstrates lack of bias.　Juror 10 gave free, open, and affirmative answers in response to non-leading questions.　When asked whether her experience would not be front-of-mind during testimony she answered: "[a]bsolutely.　I've done a lot of healing.　I also believe a jury of your peers includes people that have been sexually assaulted because it does happen."　Juror 10 explained why she participated in therapy, what that therapy was, discussed her efforts to escape substance use, and she explained her attitudes toward law enforcement in relation to her experience of assault.　This open, non-leading discussion is what amended Rule 18.5 contemplates.　The record supports the court's finding that Juror 10 did not "have any strong emotional response" to the voir dire about sexual assault, reinforcing the correctness of its decision to empanel her.　*See Colorado*, 256 Ariz. at 102 ¶ 22 ("If the juror's demeanor, conduct, or other factors give the court a reason to disbelieve his or her personal assurances of serving fairly and impartially, the court should strike the juror for cause.").　This stands in stark contrast to the record concerning Juror 6, which found the State's own counsel admitting that Juror 6's eyes moistened while discussing her prior victimization, which is evidence of demeanor contrary to the superior court's empanelment that we must weigh.

---

The Arizona Supreme Court's Task Force on Jury Data Collection, Practices, and Procedures relied extensively on Professor Salerno's work in recommending the changes substantially adopted to Rules 18.4 and 18.5. *See* Supreme Court of Arizona, *Report and Recommendations Statewide Jury Selection Workgroup: A Workgroup of the Task Force on Jury Data Collection, Practices, and Procedures* (2021), https://www.azcourts.gov/Portals/74/Jury%20TF/SJS%20Workgroup/SJSW_Final%20Report%20and%20Recommendations_11_01_21.pdf?ver=QosXeyxN0xkk1IdwRQF-cw%3d%3d.

¶95         Like the Opinion, I reject Puga's argument that Juror 10's background as a sexual assault victim means she is biased.  Our law has long recognized the important principle that being a victim of a crime – even of the crime charged in a criminal trial – does not automatically disqualify a potential juror.  *State v. Rose*, 121 Ariz. 131, 140 (1978) ("[A] juror need not be stricken for cause simply because he was the victim of a crime similar to the one with which the defendant is charged.").  The suggestion that crime victims may be automatically excluded as biased likewise offends Arizona's Victim's Bill of Rights.  *See* Ariz. Const., art. 2, § 2.1.   That remains true now that our supreme court has abolished peremptory challenges.  *See Colorado*, 256 Ariz. at 103 ¶¶ 24-29 (explaining the court did not abuse its discretion by not striking a juror who had experienced domestic violence in a domestic violence murder case).  That principle is important given the constitutional nature of the right not to be excluded from jury service for invidious purposes.  *See Powers v. Ohio*, 499 U.S. 400, 409 (1991).   The court analyzed well the totality of the circumstances as Rule 18.5(h) required of it, protecting Puga's rights, but also Juror 10's right to participate in the jury.  *See id.* at 407 ("Jury service preserves the democratic element of the law, as it guards the rights of the parties and ensures continued acceptance of the laws by all of the people.").  For all of these reasons, I agree with my colleagues that Juror 10 was properly seated on this jury.

## CONCLUSION

¶96        For these reasons, I respectfully dissent.  I also commend the candor of the State's co-counsel in this matter, which I believe helped make this case one that merits reversal.  Prosecutors have a special role as advocates within the justice system.  *Matter of Martinez*, 248 Ariz. 458, 463 ¶ 8 (2020).  They must ensure that defendants receive procedural safeguards to prevent erroneous convictions.  *Id.*  By acknowledging in voir dire that a juror the State might have preferred sit on the jury had an emotional reaction, the State's co-counsel acted as a "minister[] of justice and exercise[d] professionalism even in the heat of trial."  *State v. Hulsey*, 243 Ariz. 367, 394 ¶ 123 (2018); *see* Ariz. R. Sup. Ct. 42, ER 3.8 ("Special Responsibilities of a Prosecutor.").  Honoring that duty here, regardless of the trial's outcome, was a victory for the prosecution.

